

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CR–16–893

| | |
|---|---|
| | Opinion Delivered: May 24, 2017 |
| CHARLES H. CAMPBELL, JR. | APPEAL FROM THE MISSISSIPPI COUNTY CIRCUIT COURT, CHICKASAWBA DISTRICT [NO. 47CR-15-117] |
| APPELLANT | |
| V. | |
| | HONORABLE CINDY THYER, JUDGE |
| STATE OF ARKANSAS | |
| APPELLEE | AFFIRMED |

## KENNETH S. HIXSON, Judge

Appellant Charles H. Campbell, Jr., was charged with first-degree murder after he shot and killed his friend, Rodney Lutes, with a handgun. After a jury trial, the jury convicted Campbell of the lesser-included offense of manslaughter. Campbell was sentenced to ten years in prison for the manslaughter conviction, and his sentence was enhanced by fifteen years pursuant to the jury's finding that he had employed a firearm in committing the offense.

Campbell now appeals, raising two arguments for reversal. First, he argues that the trial court erred in refusing to give a jury instruction on the lesser-included offense of negligent homicide. Next, Campbell contends that the firearm enhancement violated the constitutional prohibition against double jeopardy. We affirm.

Campbell and Lutes, both in their early 50s, had been friends since they were teenagers. According to Campbell they were like brothers. Over the years the two men

would drink together and would occasionally get into arguments. Lutes bought a house, and Campbell moved in with him in December 2014. The house had an extra bedroom where Campbell's fifteen-year-old son, C.C., would stay on weekends when Campbell had visitation with him.

On Saturday, February 28, 2015, C.C. was visiting Campbell and was in the house while Campbell and Lutes watched a basketball game. Both Campbell and Lutes drank beer that afternoon while they watched the game. That evening, C.C. remained at the house while Campbell, Campbell's girlfriend, and Lutes went to a local establishment to shoot pool.

While shooting pool, Campbell and Lutes continued drinking beer. Campbell drank about fifteen beers that day, and Lutes was drinking beer and doing shots of whiskey. On the way home from shooting pool, Lutes and Campbell got into a heated argument. Lutes was unhappy about having to buy drinks for Campbell's girlfriend. As a result of the argument, Lutes told Campbell that he needed to pack his things and leave the house.

When the men returned home, Campbell went inside and told C.C. to pack his things because they were leaving. C.C. then called his mother to have her pick him up and take him back to her house. Lutes came inside the house, and C.C. heard Lutes and Campbell arguing loudly. Campbell went to his bedroom, retrieved his .38-caliber handgun, pulled the hammer back, and proceeded back into the hallway. At the end of the hallway, Campbell met Lutes and the gun discharged at close range, striking Lutes in the neck.[1]

_____

[1]The medical examiner determined that Mr. Lutes was shot at a downward trajectory.

SLIP OPINION

After Lutes was shot, Campbell told C.C. to dial 911 for help. Campbell frantically tried to save Lutes's life by performing CPR and trying to stop the bleeding. The police and the ambulance arrived on the scene, and Lutes died from blood loss shortly thereafter. According to the police, Campbell told them that he did not mean to shoot Lutes, and that he had stuck the gun up and Lutes walked into it. In a subsequent custodial statement, Campbell stated that he was afraid of Lutes that night and only wanted to scare him. He maintained that he had "shot [his] best friend accidentally."

C.C. testified as a witness for the State. He testified that when his father and Lutes returned home that night his father came into C.C.'s bedroom and was acting scared and worried. Campbell told C.C. that he did not want him around Lutes while Lutes was drinking and to pack his things. C.C. packed his things and called his mother. According to C.C., Campbell then proceeded to his bedroom to get his gun while both men were yelling at each other. C.C. stated that he tried to stop his father, but that his father "was real mad and said he would kill him." C.C. testified that "my dad was walking toward [Lutes's] room when he said he was going to kill him. He was just walking towards [Lutes] or coming after him, I guess." The men then ran into each other in the hallway, and C.C. saw his father shoot Lutes. Immediately after he shot Lutes, Campbell was saying he was sorry and to call an ambulance.

Campbell testified in his defense, and he stated that on previous occasions Lutes, who was much larger than he is, had physically assaulted him. The first assault took place when Lutes slapped him when they were teenagers. The next assault occurred in Memphis about fifteen years ago when Lutes chased him down and they got into an altercation. The next

one occurred about ten years ago when Lutes attacked him and caused what Campbell called "superficial injuries."[2]  Within the past year, Campbell recounted another occasion when, after both men were arrested for public intoxication, they got into an altercation after Lutes's wife picked them up from the jail and they were riding home.

Campbell indicated that Lutes's demeanor changed when he was intoxicated, that he was an "angry drunk," and that when he was drinking it was not uncommon for Lutes to order him to leave the house.  Campbell testified that, on one such occasion, Lutes came after Campbell, grabbed him, said he was going to "whip [his] ass," and said "get the f★★★ out of my house."  Campbell stated that on that occasion he retreated to his room and called 911, and that after the police arrived he left and went to his father's house.  Campbell stated that he was in fear of Lutes based on the prior abuse and the fact that "he was so mean and horrible to me."

Campbell gave his version of the events that occurred on the night of the shooting. Campbell stated that as they were riding home from playing pool, Lutes said, "All right you son of a bitch just get your shit and your dog and get the hell out of my house."  Campbell was screaming and arguing with Lutes in the car, and then he entered the house with the intention of packing his things and leaving with his son.  When Campbell went to his room, Lutes kept yelling at him, and Campbell grabbed his gun and pulled the hammer back. Campbell heard his son say, "Stop dad," but Campbell proceeded with the gun into the hallway toward Lutes.  He stated that Lutes was hollering at him and coming toward him,

---

[2]Defense witness Dan Ritchey testified that, on that occasion, he was Lutes's neighbor and Campbell came to his door with a bloody face and shirt saying that Lutes was going to kill him.

and that he collided with Lutes and the gun accidentally went off. Campbell testified that he was afraid, that he did not want Lutes to hurt him again, and that he had the gun only to scare Lutes and warn him off. Campbell insisted that he had no intention of hurting Lutes and did not mean to shoot him.

Although Campbell was charged with first-degree murder, the jury returned a verdict finding Campbell guilty of manslaughter. On appeal from his manslaughter conviction, Campbell first argues that the trial court erred in refusing to give a jury instruction on the lesser-included offense of negligent homicide. Pursuant to Ark. Code Ann. § 5-10-104(a)(3) (Repl. 2013), a person commits manslaughter if the person *recklessly* causes the death of another person. Arkansas Code Annotated section 5-10-105(b)(1) provides that a person commits negligent homicide if he *negligently* causes the death of another person. Campbell contends that a negligent-homicide instruction should have been given because there was evidence from which the jury could have concluded that he was only negligent, as opposed to reckless, in causing Lutes's death.

Arkansas Code Annotated section 5-2-202 defines the culpable mental states and provides, in pertinent part:

(3) "RECKLESSLY."
  (A) A person acts recklessly with respect to attendant circumstances or a result of his or her conduct when the person *consciously disregards* a substantial and unjustifiable risk that the attendant circumstances exist or the result will occur.
  (B) The risk must be of a nature and degree that disregard of the risk constitutes a gross deviation from the standard of care that a reasonable person would observe in the actor's situation; and

(4) "NEGLIGENTLY."
  (A) A person acts negligently with respect to attendant circumstances or a result of his or her conduct when the person *should be aware of* a substantial and unjustifiable risk that the attendant circumstances exist or the result will occur.
  (B) The risk must be of such a nature and degree that the actor's failure to perceive the risk involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation considering the nature and purpose of the actor's conduct and the circumstances known to the actor.

(Emphasis added.) Campbell asserts that there were numerous factors suggesting that he did not *consciously disregard* a substantial and unjustifiable risk, but rather that he only *should have been aware* of the risk of pointing the gun at the victim. Campbell notes that Lutes was significantly taller than he is, and asserts that the fact that the trajectory of the bullet went downward through Lutes's neck compels the conclusion that Lutes was leaning down when the gun fired. Because Lutes was heavily intoxicated (almost four times the legal limit), was arguing with Campbell, and had beaten Campbell numerous times in the past, Campbell submits that there was a fact question as to whether he was only negligent when he attempted to avoid another beating by pointing the gun at Lutes. Campbell also states that because the hammer was cocked, it was much easier to discharge the handgun, whether purposely or accidentally. One of the police officers testified that when the hammer was cocked it was basically like a "feather trigger." Campbell maintains that he had no intent to kill the victim, which was evidenced by the fact that he did not flee but instead attempted to save Lutes's life.

Campbell cites two cases where the appellate court reversed and remanded manslaughter convictions because the trial court erred in failing to give a lesser-included instruction on negligent homicide. *See Langley v. State*, 261 Ark. 539, 549 S.W.2d 799 (1977), and *Worring v. State*, 2 Ark. App. 27, 616 S.W.2d 23 (1981).

However, based on our review of the record, we conclude that Campbell's argument regarding the omitted negligent-homicide jury instruction is not preserved for review. This is because, although Campbell asked for an instruction on negligent homicide, he failed to proffer a written copy of his proposed instruction. In *Hart v. State*, 301 Ark. 200, 783 S.W.2d 40 (1990), our supreme court made it clear that a defendant must proffer a typewritten copy of his proposed jury instruction to preserve the issue on appeal. In *Hart*, the appellant had asked the trial court to instruct the jury on the legal requirement that a confession be corroborated, and although he did not proffer a typewritten instruction, appellant read Ark. Code Ann. § 16-89-111(d) (the relevant statute) to the court and asked that the jury be so instructed. The supreme court, however, held that this was insufficient to preserve the point on appeal challenging the trial court's failure to give the instruction because there was no written proffer. Because there was no written proffer in the instant case, we likewise must hold that Campbell's argument pertaining to the jury instruction is not preserved.

Campbell's remaining argument is that the firearm enhancement imposed by the jury should be set aside because it constituted double jeopardy. The Fifth Amendment to the United States Constitution and article 2, section 8 of the Arkansas Constitution require that no person be twice put in jeopardy of life or liberty for the same offense. The Double Jeopardy Clause protects criminal defendants from (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. *Simon v. State*, 2017 Ark. App. 209, ___ S.W.3d ___. In order to determine whether the same act violates two separate statutory

provisions, we apply the same-elements test, commonly referred to as the *Blockburger* test, which states as follows:

> [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not…. [A] single act may be an offense against two statutes, and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other.

*Blockburger v. United States*, 284 U.S. 299, 304 (1932). The Arkansas General Assembly has codified this constitutional protection at Ark. Code Ann. § 5-1-110(b), which provides that an offense is included in an offense charged if the offense is established by proof of the same or less than all of the elements required to establish the commission of the offense charged.

In this case Campbell was convicted of manslaughter, which required the jury to find that he recklessly caused Lutes's death. *See* Ark. Code Ann. § 5-10-104(a)(3). His ten-year sentence for committing manslaughter was enhanced by fifteen years pursuant to Ark. Code Ann. § 16-90-120(a), which provides:

> Any person convicted of any offense that is classified by the laws of this state as a felony who employed any firearm of any character as a means of committing or escaping from the felony, in the discretion of the sentencing court, may be subjected to an additional period of confinement in the Department of Correction for a period not to exceed fifteen (15) years.

Campbell claims that the enhanced sentence for possessing a firearm resulted in him being punished twice for the same offense. He contends that because his manslaughter conviction was based on his use of a firearm, the firearm enhancement was punishment for the same conduct and violated his right against double jeopardy.

We conclude that Campbell's double-jeopardy argument is not preserved for appeal because it was not timely raised below.  In this case Campbell did not object or raise a double-jeopardy argument after the jury returned its verdict and sentence enhancement at trial.  Instead, he first raised the double-jeopardy issue four days later in a motion for new trial.  This came too late.

An issue must be presented to the trial court at the earliest opportunity in order to preserve it for appeal.  *Fuller v. State*, 316 Ark. 341, 872 S.W.2d 54 (1994).  Even a constitutional issue must be raised at trial in order to preserve the issue for appeal.  *Id.*  An objection made for the first time in a motion for new trial is untimely, *Donovan v. State*, 95 Ark. App. 378, 237 S.W.3d 484 (2006), and a motion for new trial cannot be used as an avenue to raise new allegations of error that have not been raised and preserved at trial. *Wooten v. State*, 2016 Ark. 376, 502 S.W.3d 503.  In *Brown v. State*, 347 Ark. 308, 65 S.W.3d 394 (2001), our supreme court held that to preserve a double-jeopardy claim the appellant must object after the jury returns the convictions.

In the present case Campbell did not object at the first opportunity and raise his double-jeopardy argument to the trial court at the time he was convicted at trial.  This issue should have been raised then and could not be revived by a subsequent new-trial motion.

In any event, there is clearly no merit to appellant's argument on this point.  In *Davis v. State*, 93 Ark. App. 443, 220 S.W.3d 248 (2005), we addressed this issue and held that the defendant's double-jeopardy rights were not offended by application of both the firearm-enhancement and the defendant's underlying aggravated-assault conviction.  And in *Scott v. State*, 2011 Ark. App. 296, we found no merit to the appellants' claim that

9

aggravated robbery and the felony-enhancement statute required exactly the same proof and therefore constituted double jeopardy. In rejecting that argument, we wrote:

> Contrary to appellants' argument, the firearm enhancement under section 16-90-120 is not a substantive criminal offense; rather, it is a sentencing enhancement specifically intended to provide additional punishment for the use of a firearm during the commission of the underlying felony itself. Thus, the enhancement provision does not violate section 5-1-110(a)'s proscription against being convicted of more than one "offense" under the circumstances set out in the statute, and appellants' double-jeopardy rights were not violated.

*Scott*, 2011 Ark. App. 296, at 9; *see also Williams v. State*, 364 Ark. 203, 217 S.W.3d 817 (2005) (holding that section 16-90-120 is only a sentence enhancement added to the initial sentence). Based on our reasoning in *Davis* and *Scott*, there was no double-jeopardy violation in this case.

Affirmed.

GRUBER, C.J., and KLAPPENBACH, J., agree.

*James W. Harris*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Vada Berger*, Ass't Att'y Gen., for appellee.